UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| ZANAKI F. RENIBE<br>6028 Logans Way<br>Ellicott City, MD 21043<br><br>*Plaintiff*,<br><br>v.<br><br>UNIVERSITY OF MARYLAND,<br>COLLEGE PARK<br>4716 Pontiac Street<br>Suite 2117 Seneca Building<br>College Park, MD 20742<br><br>And<br><br>JOHN ROMANO<br>4716 Pontiac Street<br>Suite 2117 Seneca Building<br>College Park, MD 20742<br><br>And<br><br>JOHN FARLEY<br>4716 Pontiac Street<br>Suite 2117 Seneca Building<br>College Park, MD 20742<br><br>*Defendants* | Case No. 8:22-cv-618<br><br>Jury Trial Demand |

## **COMPLAINT**

Plaintiff Zanaki F. Renibe (hereinafter "Plaintiff Renibe," "Mr. Renibe," or "Plaintiff") by and through his attorneys, hereby files this Complaint against the University of Maryland, College Park, (hereinafter "Defendant University," "University of Maryland," or "UMD"), John Farley, and John Romano hereinafter ("Defendant Farley" or "Defendant Romano"). Plaintiff seeks relief

1

pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. § 1981; and breach of contract and seeks damages, including but not limited to declaratory, injunctive, and other equitable relief; compensatory and punitive damages; and litigation expenses and reasonable attorneys' fees based on Defendant's discriminatory, harassing, retaliatory, and otherwise unlawful actions against Plaintiff Renibe.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1981.

2. Plaintiff has exhausted all administrative remedies prior to filing suit.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

## PARTIES

4. Plaintiff Renibe is an African American male and a resident of the state of Maryland. Plaintiff Renibe was an employee of Defendant University of Maryland.

5. Defendant University of Maryland is a public university in Maryland and an employer within the meaning of the statutes under which Plaintiff brings his claims.

6. John Romano is the CASL (Center for Advanced Study of Language) Director of Technology, a Caucasian male, Plaintiff's supervisor.

7. John Farley is the former Interim Operations Director for the Division of Research and a Caucasian/white male.

8. Defendants Romano and Farley are being sued in their official capacities.

## FACTS

9. Mr. Renibe began working as a Security Specialist in July 2009 at the University of Maryland, College Park ("UMD"), Division of Research, Center for Advanced Study of Language's ("CASL") Information Technology ("IT") section. He was promoted to a Program Management Specialist in 2010 and became a Security Coordinator in 2012. Mr. Renibe worked with IT infrastructure and was responsible for the CASL security program, which is a government requirement for monitoring any employees with security clearance to ensure that these personnel are following all requisite procedures. The contracts with the federal government on which Mr. Renibe worked required him to have a security clearance.

10. In April 2013, there were layoffs in CASL which impacted a number of Caucasian employees, including employees in Plaintiff's department and section. Employees who were selected to be laid off received several months' advanced notice of their pending layoffs and were permitted to continue working until the day of their lay off. At the time the employees were given notice of the lay offer, they were informed of the lay off in their regular work location and were not required to travel to another location at the University of Maryland and were not escorted by uniformed and armed security officers. After these employees received notice of their layoffs, they were not immediately stripped of their building access or prohibited from returning to their offices to collect personal belongings.

11. Mr. Renibe worked closely with Duane Shaw, an African American male, and they both were supervised by John Romano, CASL Director of Technology, and a Caucasian/white male. During his tenure, Mr. Renibe was an exemplary employee (former "employee of the year")

and was involved in many research initiatives. Through 2018, Mr. Renibe received performance reviews which indicated that he met or exceeded performance objectives.

12. From 2009 through 2018, Mr. Renibe was subjected to job bias and humiliation by Mr. Romano. Mr. Renibe also faced intimidation in the workplace which was condoned by Mr. Romano, such as when other IT engineers excluded him from planning and infrastructure meetings, even though it is a job requirement for engineers to communicate with each other because the systems on which they work overlap. Mr. Renibe was one of only three African American males in the building; and his opinions and achievements were not respected. For instance, when he received his first promotion, the Chief of Staff told him that he was not getting "shit". There was a discriminatory culture that impacted the work place over the years, like for example that he was always miscalled the names of other male CASL employees who also belonged to a minority group, including Chauncy, Axel, and Marshawn. He was also frequently called a "spade", a derogatory Reconstruction era term for African Americans.

13. In May 2018, Mr. Romano called Mr. Renibe to his office and gave him a Counseling Memorandum. The Memorandum contained myriad inaccuracies, including disobeying orders, acting non-compliantly, and not performing the job assigned. Mr. Renibe was told that the Memorandum was not a disciplinary action, just a tool to facilitate discussion. Mr. Renibe was not inclined to discuss such nonsense and left the room.

14. Eventually, Mr. Renibe filed a grievance with his union to protest his treatment. After his Step I hearing, Dr. Fetter advised him that he would remove the Memorandum from Mr. Renibe's file if the grievance was withdrawn, which Mr. Renibe did on the condition that he not be supervised by Mr. Romano any more. However, Mr. Romano and other employees continued

to harass Mr. Renibe and make racially inappropriate comments. Mr. Renibe was not happy about his work environment but continued to work there because his daughter wanted to attend the university.

15. On November 15, 2018, Mr. Renibe, Mr. Shaw, and Aye Vines, an African American female, were terminated - these terminations were intimidating and hostile. Mr. Renibe, Mr. Shaw, and Ms. Vines were called to a separate building, which held additional office space and was a secure location on the University of Maryland campus, and were given notice of their termination, stripped of their building access, and prohibited from returning to their offices to collect their personal belongings. This building, separate from the main building, had been evacuated primarily for this interaction. Engineers in Mr. Renibe's office space were told to close and lock their doors. An armed plain clothed officer was waiting in the room adjacent to the room in which Mr. Renibe, Mr. Shaw, and Ms. Vines were terminated. This contrasts with the layoffs that occurred at CASL in April 2013, which were handled very differently than the layoffs of Mr. Shaw, Mr. Renibe, and Aye Vines. The employees who were laid off in 2013 were informed within their own building, not required to travel to a different location escorted by an armed officer, not prohibited from returning to their offices to collect their personal belongings, and not immediately stripped of their building access before receiving their layoff letters. The University claimed that the presence of an armed officer was necessary for Mr. Renibe, Mr. Shaw, and Ms. Vines because they were not known to Mr. Farley, so he did not know how they would react to their being laid off and that UMD feared they would have a weapon. However, there was no advance notice given to Mr. Renibe, Mr. Shaw, and Ms. Vines about their impending layoffs. Furthermore, such "fear" was not demonstrated by the University of Maryland laying off other employees. The other laid

off employees received advanced notice of their layoffs, were allowed to stay in the building, and were informed as a group, whereas Mr. Renibe, Mr. Shaw, and Ms. Vines did not receive advanced notice, were not allowed to stay in the building, and were isolated and told separately. The way in which Mr. Renibe, Mr. Shaw, and Ms. Vines were treated was hostile and discriminatory, though this is consistent with how they were treated while employed by UMD, such as being called "spades" and the names of other African American UMD employees.

16. In contrast to how Mr. Renibe, Mr. Shaw, and Ms. Vines were treated, a fourth employee was also terminated at the same time through a layoff, but this fourth employee was notified of her layoff in Mr. Farley's office and was not subjected to the same treatment as Mr. Renibe, Mr. Shaw, and Ms. Vines, such as being required to report to a remote building where there was an armed security presence, despite this fourth employee having the same access as Mr. Renibe had. Mr. Renibe, Mr. Shaw, and Ms. Vines were told of their layoffs in an off-site location. In addition, a formal debriefing is required for security purposes when an employee with a security clearance loses a position. The UMD did not perform this debriefing for Mr. Renibe. Mr. Renibe's layoff was administered by Mr. Farley, but it is unclear which individual or individuals at the University of Maryland made the decision to layoff Mr. Renibe. However, the decision to deactivate Mr. Renibe's top-secret status was made by Mr. Romano, and such deactivation is not required by the government.

1. 17. Mr. Renibe's layoff was a pretext for a discriminatory termination. The stated reason for his termination was budgetary constraints, but Mr. Renibe was one of the lowest paid engineers on his team, so terminating him did not make financial sense for the stated reason of budgetary constraints. In addition, although CASL claimed to be experiencing financial

difficulties, an IT employee's reclassification was approved and granted at the same time of Mr. Renibe's termination. Mr. Renibe also questions how it made fiscal sense for CASL to lay off himself, who had a salary of $71,000, and Ms. Vines, who had a salary of $92,000, but not Mr. Romano, who had a salary of $217,000, especially considering that Mr. Renibe and Ms. Vines' credentials were necessary for the functioning of CASL while Mr. Romano was not credentialed to carry out Mr. Renibe and Ms. Vines' job duties. Mr. Renibe and Ms. Vines' credentials and statuses with government sponsors were necessary for UMD to maintain its requisite security protocols in compliance with government contracts. Mr. Renibe and Ms. Vines maintained their security clearances through the National Industrial Security Program, and this was written into their employment contracts. Mr. Renibe believes that UMD may have breached its government contracts by letting him and Ms. Vines go, as UMD would no longer be in compliance with contractual security protocol. In addition, the budget for Mr. Renibe and Ms. Vines' salaries was supposed to remain separate from the research budget. Mr. Renibe, Mr. Shaw, and Ms. Vines were not debriefed, which is required by security protocols, nor were their sponsors informed of their being laid off, which is also required. Furthermore, during Mr. Renibe's tenure at UMD, UMD never allowed security clearances to drop nor lapse for any individuals except for himself, Mr. Shaw, and Ms. Vines.

18.     On February 5, 2019, Mr. Renibe, Mr. Shaw, and Ms. Vines (collectively, "grievants") requested a hearing at Step II of the University System of Maryland Grievance Procedure and alleged discrimination on the basis of race, sex and age, in the University of Maryland's decision to terminate their employment and not follow protocol to protect their security

clearances after their termination. The grievants subsequently also alleged discrimination in the decision to deactivate their security clearances.

19. On July 1, 2019, Mr. Renibe, Mr. Shaw, and Ms. Vines' grievance was upheld by Hearing Examiner Andrea LeWinter. The Hearing Examiner commented on the evidence at the grievance proceeding, including the following: "...for all three grievances, Mr. Farley chose to perform the layoffs in a manner - having an armed officer present, isolating the employees, and denying the employees the ability to return and obtain their personal effects - that at best evidenced a shocking lack of social awareness and at worst was a clear indication of racial discrimnation."

20. As a remedy, the Hearing Examiner concluded, "...this Hearing Examiner will require [the University of Maryland] to pay the grievants their full salaries until their clearances are fully reinstated, not to exceed a year from the initial date of the layoff letter or November 15, 2019. If, as of the writing of this Decision, the clearances have already been reinstated or if the clearances are reinstated prior to November 15, 2019, then the grievant(s) shall provide [the University of Maryland] the date upon which he and/or she received/s notification of the reinstatement and [the University of Maryland] shall compensate the grievant(s) for the period between the end of the 90-day layoff notification, February 13, 2019, and the clearance reinstatement. The rationale for the limitation of one year on the payment award is derived from the grievants' repeated request for an award of an additional nine months of payment based on their assertion that this amount of time should be sufficient for clearance reinstatement." To date, the University has not complied with the decision of the Hearing Examiner to pay Mr. Renibe until his security clearance is reinstated. In addition, the hearing did not address the discrimination that

Mr. Renibe, Mr. Shaw, and Ms. Vines faced other than providing a record of UMD admitting its bias. UMD highlighted the issue of clearance but not discrimination.

21. Mr. Renibe has suffered substantial losses as a result of his termination from employment. He was the primary income source for his family. Mr. Renibe's insurance at the University of Maryland had covered him and his family, but since his termination, he has not been able to attain insurance with the same level of coverage. Plaintiff's termination has adversely impacted his marriage, and he has lost the ability to utilize the remission of tuition for himself and his family.

<u>**COUNT I**</u>
**Violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")**
**42 U.S.C. § 2000e** *et seq.*
**Race Discrimination**
**Disparate Treatment and Hostile Work Environment**
**(Renibe v. University of Maryland)**

22. Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

23. At all pertinent times, Defendant University was an employer subject to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

24. At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

25. Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of race with respect to an employee's compensation, terms, conditions, or privileges of employment.

26. Defendant University and Mr. Romano violated Title VII of the Civil Rights Act of 1964 when they discriminated against Plaintiff Renibe on the basis of race between 2009 and

2018 when: Mr. Romano gave Mr. Renibe an inaccurate Counseling Memorandum; when Mr. Renibe's work contributions and achievements were belittled and/or not acknowledged by being told he was not getting "shit"; by being called other African American names by fellow employees; by being called a "spade"; the University of Maryland terminated Mr. Renibe's employment in November 2018 and deactivated Mr. Renibe's clearance without providing a rationale and even after assurances from Mr. Farley that it would not, which led to Mr. Renibe mistakenly stating that he had clearance when applying to other jobs; Mr. Renibe was treated differently from previous employees who were laid off as well as a fourth employee who was laid off at the same time; Mr. Renibe was treated as if he were hostile when he was laid off; and the University of Maryland chose to deactivate Mr. Renibe's top secret status without being required to do so. The actions taken against Mr. Renibe and, specifically, the termination, was based on race because he faced a pattern of discrimination over a number of years before he was terminated and was selected for termination with two other African American individuals; the reasons given for the termination are false; the University did not follow its own policies in his termination as evidenced by the decision of the Hearing Examiner; Mr. Renibe was treated differently than similarly situated non-African American employees in his department and even differently in the manner in which he was terminated; and the Defendant has provided a shifting articulation of the reason for his termination.

27. As a direct and proximate result of Defendants' actions, Plaintiff Renibe has suffered emotional distress and pain and suffering.

28. Defendants' actions directly and proximately caused Plaintiff Renibe to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering,

stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

29. Defendants engaged in their discriminatory actions described above with malice or with reckless indifference to Plaintiff Renibe's legal rights.

30. Defendants had no legitimate business reason for any such acts.

31. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendants may have engaged in other discriminatory practices that are not yet fully known.

**COUNT II**
**Violation of the Civil Rights Act of 1866**
**42 U.S.C. § 1981**
**Race Discrimination**
**Disparate Treatment and Hostile Work Environment**
**(Renibe v. Defendants Romano and Farley)**

32. Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

33. Section 1981 prohibits discrimination on the basis of race in the making and enforcing of contracts, with respect to an employee's compensation, terms, conditions, or privileges of employment. Defendants in their official capacities are liable for their actions.

34. Defendant University and Mr. Romano violated Section 1981 when they discriminated against Plaintiff Renibe on the basis of race between 2009 and 2018 when: Mr. Romano gave Mr. Renibe an inaccurate Counseling Memorandum; when Mr. Renibe's work contributions and achievements were belittled and/or not acknowledged by being told he was not getting "shit"; by being called other African American names by fellow employees; by being called a "spade"; the University of Maryland terminated Mr. Renibe's employment in November 2018 at

the request of Defendants Romano and Farley and deactivated Mr. Renibe's clearance without providing a rationale and even after assurances from Mr. Farley that it would not, which led to Mr. Renibe mistakenly stating that he had clearance when applying to other jobs; Mr. Renibe was treated differently from previous Caucasian/white employees who were laid off as well as a fourth employee who was laid off at the same time; Mr. Renibe was treated as if he were hostile when he was laid off; and the University of Maryland chose to deactivate Mr. Renibe's top secret status without being required to do so. The actions taken against Mr. Renibe and, specifically, the termination, was based on race because he and Mr. Shaw and Ms. Vines faced a pattern of discrimination over a number of years from Defendant Romano before MR. Renibe was terminated and was selected for termination with two other African American individuals; the reasons given for the termination are false; the University did not follow its own policies in his termination as evidenced by the decision of the Hearing Examiner; Mr. Renibe was treated differently than similarly situated non-African American employees in his department and even differently in the manner in which he was terminated; and the Defendants have provided a shifting articulation of the reason for his termination.

35. As a direct and proximate result of Defendants' actions, Plaintiff Renibe has suffered emotional distress and pain and suffering.

36. Defendants' actions directly and proximately caused Plaintiff Renibe to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

37. Defendants engaged in their discriminatory actions described above with malice or with reckless indifference to Plaintiff Renibe's legal rights.

38. Defendants had no legitimate business reason for any such acts.

39. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendants may have engaged in other discriminatory practices that are not yet fully known.

## COUNT III
### Breach of Contract
### (Renibe v. University of Maryland)

40. Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

41. Plaintiff's employment was subject to certain terms and conditions including a grievance process that was binding on the Defendant University

42. Plaintiff Renibe, Mr. Shaw and Ms. Vines all filed a grievance after their termination alleging among other claims, that they were laid off due to discrimination. A Hearing Examiner held an evidentiary hearing and issued an award requiring the University to pay Mr. Renibe all wages due until his security clearance was fully reinstated, not to exceed a year from the layoff letter or until November 15, 2019. Despite the binding nature of the Hearing Examiner's decision and the award of the Hearing Examiner, the University has failed to pay Mr. Renibe the wages due.

43. As a direct and proximate result of Defendant's actions, Plaintiff Renibe has suffered loss of income.

44. Defendants's actions directly and proximately caused Plaintiff Renibe to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

45. Defendant engaged in its discriminatory actions described above with malice or with reckless indifference to Plaintiff Renibe's legal rights.

46. Defendant had no legitimate business reason for any such acts.

47. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Renibe prays as follows:

A. That the Court issue an Order declaring Defendants violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, and committed breach of contract and declaring Plaintiff eligible to receive equitable and other relief;

B. Enter judgment against Defendants

C. Issue a permanent injunction prohibiting Defendants from engaging in any further acts of discrimination, harassment, and retaliation;

D. Enter judgment in favor of Plaintiff against Defendants for all equitable monetary damages available under the law;

E. Order Defendants to reinstate Plaintiff's employment, and to refrain from any action against Plaintiff, or any other person, for participating in or supporting this case in any manner;

F. Order Defendants, individually and collectively, to pay compensatory and punitive damages in an amount no less than five million dollars ($5,000,000.00);

G. Order Defendants to pay Plaintiff's medical retirement;

H. Order Defendants to pay Plaintiff's reasonable attorneys' fees, expert fees, and costs; and

I. Order Defendants to pay pre-judgment and post-judgment interest as provided by law.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims against Defendants.

Date:  March 11, 2022              Respectfully submitted,

_/s/ David A. Branch_
David A. Branch
Bar No. 22862
The Law Office of David A. Branch & Associates, PLLC
1828 L Street, N.W., Suite 820
Washington, D.C. 20036
Phone: (202) 785-2805
Fax: (202) 785-0289
Email: davidbranch@dbranchlaw.com