22-IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ZANAKI F. RENIBE                        :

                                        :

     v.                    :   Civil Action No. DKC 22-0618

                                        :

UNIVERSITY OF MARYLAND, COLLEGE
PARK, et al.                   :

**MEMORANDUM OPINION**

Presently pending in this employment discrimination case is
the motion to dismiss by Defendants University of Maryland, John
Romano, John Farley, Laurie Locascio, and Steven Fetter.  (ECF No.
12).  The issues have been briefed, and the court now rules, no
hearing being necessary.  Local Rule 105.6.  For the reasons that
follow, the motion will be granted in part and denied in part.

**I.   Background**

Plaintiff Zanaki F. Renibe is an African American male who
worked at the University of Maryland, College Park, from 2009 to
2018.  (ECF No. 8, at 2-7).[1]  He started as a Security Specialist
before being promoted to a Program Management Specialist and
finally a Security Coordinator.  (ECF No. 8, at 3-4).  In these

---

[1] Unless otherwise noted, the facts outlined here are in the
Amended Complaint.  The facts are construed in the light most
favorable to Plaintiff.  The Amended Complaint refers to Plaintiff
as "African American" and to certain co-workers as "Caucasian" and
"white."  (ECF No. 8, at 3, 4).  The court will use that terminology
when discussing the facts of this case.

roles, he worked with IT infrastructure and was responsible for managing a security program called CASL. (ECF No. 8, at 4). For most of his tenure at the University, Plaintiff received performance reviews which indicated that he met or exceeded performance objectives. (ECF No. 8, at 5). Plaintiff was one of only three African American males who worked in his office. (ECF No. 8, at 5).

Plaintiff's CASL program was supervised by John Romano, a Caucasian male who was the CASL Director of Technology. (ECF No. 8, at 3-4). Plaintiff alleges that Mr. Romano "subjected" Plaintiff to race-based "harass[ment]" and "humiliation." (ECF No. 8, at 5). He also alleges that Mr. Romano "condoned" racial harassment that was perpetrated by other white male employees. (ECF No. 8, at 5). For instance, an employee once approached Plaintiff and said, "Hey Z, weren't your people once referred to as 'Spades'?" (ECF No. 8, at 5). Plaintiff was also "miscalled the names of other male CASL employees who . . . belonged to a minority group, including Chauncy, Axel, and Marshawn." (ECF No. 8, at 5). Another white employee allegedly "angrily confronted" Plaintiff during a dispute regarding a co-worker's office assignment. (ECF No. 8, at 6). Plaintiff also believes that "his opinions and achievements were not respected." (ECF No. 8, at 5). Finally, Plaintiff alleges that, before he was hired, he was "subjected to a racially discriminatory screening process" because

"his application was not processed for several months" and because the person who conducted the interview said that Plaintiff "did not sound like the person he imagined with his last name." (ECF No. 8, at 3).

In May 2018, Mr. Romano gave Plaintiff a Letter of Counseling, which stated that Plaintiff was "disobeying orders, acting non-compliantly, and not performing the job assigned." (ECF No. 8, at 5). Plaintiff believed these accusations were false, and he filed a grievance with his union to protest his treatment. (ECF No. 8, at 5). He later withdrew this grievance on the condition that the Letter of Counseling would be removed from his employment file. (ECF No. 8, at 5). Even after the grievance was withdrawn, "Mr. Romano and other employees continued to harass [Plaintiff] and make racially inappropriate comments." (ECF No. 8, at 5).

On November 15, 2018, the University laid off Plaintiff along with two of his African American co-workers, Aye Vines and Duane Shaw.[2] (ECF No. 8, at 6). That day, University officials instructed Plaintiff, Ms. Vines, and Mr. Shaw to leave the building in which they normally worked and took them to a "secure . . . separate building" which had been "evacuated." (ECF No. 8, at 6-7). When the three employees arrived at that building, University

---

[2] Mr. Shaw filed his own discrimination complaint in this court, *Shaw v. University of Maryland, College Park, et al.*, 21-cv-1986-GLS.

officials isolated each employee into different rooms, told each employee that he or she was being laid off, and then took away that employee's building access. (ECF No. 8, at 7). All of this was done with an armed officer present. (ECF No. 8, at 7). The employees were barred from returning to their offices to collect their personal belongings. (ECF No. 8, at 7). The University allegedly claimed that the termination was done this way because John Farley—the Caucasian official who administered the layoffs—did not know the African American employees he was firing, so he did not know how they would react and feared they would have a weapon. (ECF No. 8, at 7). The stated reason for Plaintiff's layoff was budgetary constraints. (ECF No. 8, at 8).

Meanwhile, Plaintiff alleges that Caucasian employees laid off during his tenure did not face the same treatment. (ECF No. 8, at 4, 7). These employees received several months' advanced notice of their pending layoffs, were informed of the layoff in their regular work location, were not escorted by armed security officers, were not immediately stripped of their building access, and were not prohibited from returning to their offices to collect personal belongings. (ECF No. 8, at 4, 7). Plaintiff also alleges that a fourth employee of an unspecified race was laid off on the same day as Plaintiff. (ECF No. 8, at 7). That employee had the same security access as Plaintiff, but was notified of her layoff in Mr. Farley's office and was not required to report to a remote

4

building where there was an armed security presence.  (ECF No. 8, at 7-8).

On February 5, 2019, Plaintiff, Mr. Shaw, and Ms. Vines requested a hearing to contest their firing through the University's Grievance Procedure system.  (ECF No. 8, at 9).  At the hearing, a University Hearing Examiner found that the manner in which the layoffs were conducted—having an armed officer present, isolating the employees, and denying the employees the ability to return and obtain their personal effects—at best evidenced a shocking lack of social awareness and at worst was a clear indication of racial discrimination.  (ECF No. 8, at 9).  The Hearing Examiner also ordered the University to pay Plaintiff, Ms. Vines, and Mr. Shaw their full salaries until their security clearances are fully reinstated.  (ECF No. 8, at 10).  Plaintiff alleges that the University has still not complied with this order.  (ECF No. 8, at 10).

On February 19, 2019, Plaintiff filed a Charge of Discrimination with the EEOC.  (ECF No. 12-2).[3]  In the charge, Plaintiff alleged that "[d]uring the course of [his] employment,"

---

[3] While Plaintiff did not attach the EEOC charge to the Amended Complaint, the court may consider the charge at this stage because it is attached to Defendants' motion to dismiss and "[c]ourts commonly consider EEOC charges as integral to a plaintiff's Complaint, i.e., effectively a part of the pleading, even if the EEOC charge is not filed with the Complaint." *Bowie v. Univ. of Md. Med. Sys.*, No. 14-cv-3216-ELH, 2015 WL 1499465, at *3 n.4 (D.Md. Mar. 31, 2015) (collecting cases).

he "was subjected to harassment by Director John Romano," including "written warnings which [Plaintiff] successfully grieved and had . . . removed from [his] personnel record." (ECF No. 12-2). The charge also states that Plaintiff "was subjected to lay-off" "[i]n retaliation for [his] complaints." (ECF No. 12-2). Finally, the charge claimed that "with respect to [the] harassment and lay-off," Plaintiff had been "discriminated . . . against because of [his] race (black) in violation of Title VII of the Civil Rights Act of 1964." (ECF No. 12-2).

Last year, Plaintiff sued the University and several University employees, alleging a breach of contract, a violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and a violation of 42 U.S.C. § 1981 of the Civil Rights Act of 1866. (ECF No. 1, at 9-14). Plaintiff then filed an Amended Complaint which revised several factual allegations, removed the breach of contract claim, and added citation to 42 U.S.C. § 1983 to the § 1981 claim in count two. (ECF No. 8). The Amended Complaint includes two counts. Count I raises disparate treatment and hostile work environment claims under Title VII, and names the University as the sole Defendant. (ECF No. 8, at 11-13). Count II raises race discrimination and retaliation claims under §§ 1983 and 1981. Count II names four individual Defendants in their official capacities: (1) John Romano, (2) John Farley (a former interim Operations Director who allegedly administered the layoff), (3)

Steven Fetter (an Acting Executive Director at the University who allegedly approved the layoff), and (4) Laurie Locascio (the Vice President for Research at the University, who likewise allegedly approved the layoff).  (ECF No. 8, at 3, 8, 13-14).  Defendants jointly moved to dismiss the Amended Complaint, (ECF No. 12), Plaintiff responded (ECF No. 15), and Defendants replied (ECF No. 16).

## II.  Standards of Review

When deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court must accept as true a complaint's well-pleaded allegations, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).  A court need not, however, accept legal conclusions couched as factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), or conclusory factual allegations devoid of any reference to actual events, *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

## III. Analysis

### A.   Title VII Claims

In count I, the Amended Complaint raises two Title VII claims against the University: (1) a disparate treatment claim alleging that Plaintiff was fired because of his race, and (2) a hostile

work environment claim.  (ECF No. 8, at 11-12).[4]  The University
argues that the Title VII claims should be dismissed because: (1)
Plaintiff has failed to exhaust administrative remedies under
Title VII, (2) the claims are time-barred, (3) Plaintiff has failed
to state a disparate treatment claim, and (4) Plaintiff has failed
to state a hostile work environment claim.  (ECF No. 12-1, at 5-
12).

### 1.  Exhaustion

The University argues that Plaintiff failed to exhaust
administrative remedies under Title VII because the Amended
Complaint exceeds the scope of the EEOC charge, and thus the Title
VII claims are procedurally barred.  (ECF No. 12-1, at 5-7).
Before an employee may sue under Title VII, he or she must first
exhaust a statutorily mandated administrative process.  *Chacko v.
Patuxent Inst.*, 429 F.3d 505, 508 (4th Cir. 2005).  First, the
employee must file a charge with the EEOC.  42 U.S.C. § 2000e-
5(e)(1).  That charge must "describe generally the . . . practices

---

[4] The Amended Complaint is unclear whether the disparate
treatment claim is based solely on Plaintiff's firing or on all
the allegedly discriminatory acts listed under count I.  (*See* ECF
No. 8, at 11-12).  However, in his Response to the Motion to
Dismiss, Plaintiff clarifies that his "disparate treatment" claim
is a "claim for a discriminatory termination," and that the other
discriminatory incidents listed under count I are meant to support
his core allegation that he was fired because of his race.  (ECF
No. 15, at 14-15).  Indeed, a disparate treatment claim must be
based on an "adverse employment action."  *Coleman v. Md. Ct. of
App.*, 626 F.3d 187, 190 (4th Cir. 2010).  The only such action
alleged in the Amended Complaint is the firing.

complained of." 29 C.F.R. § 1601.12(b) (2010). The EEOC then investigates the charge and, if it believes the allegations have merit, it may try to address unlawful practices "by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b). Finally, if the employee chooses to sue after that administrative process concludes, the EEOC charge "generally operate[s] to limit the scope" of the claims the employee may bring to court. *Id.* at 509 (internal quotation marks omitted).

The charge "does not *strictly* limit [the] Title VII suit which may follow." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 594 (4ᵗʰ Cir. 2012) (quoting *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4ᵗʰ Cir. 2005)) (emphasis added).[5] After all, the charge itself requires only a "general[]" explanation of the employee's complaints, *see* 29 C.F.R. § 1601.12(b), not "a detailed essay" describing each and every instance of discrimination, *see Sydnor*, 681 F.3d at 594. If it were otherwise, the exhaustion requirement would "become a tripwire for hapless plaintiffs." *Id.*

---

[5] *Sydnor* involved a claim under the Americans with Disabilities Act, not Title VII. 681 F.3d at 592. However, the ADA incorporates Title VII's enforcement scheme, "including the requirement that a plaintiff must exhaust his administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court." *Id.* at 593. Thus, *Sydnor*'s holding rested on Title VII exhaustion case law, and the Fourth Circuit has several times applied *Sydnor* when deciding Title VII exhaustion cases. *See, e.g.*, *Walton v. Harker*, 33 F.4th 165, 172-173 (4ᵗʰ Cir. 2022); *Abdus-Shahid v. Mayor and City Council of Balt.*, 674 F. App'x 267, 275 (4ᵗʰ Cir. 2017).

Thus, the touchstone of the exhaustion inquiry is whether the in-court claims and the claims before the EEOC are "reasonably related," "not precisely the same." *Id.* at 595 (internal quotation marks omitted). For instance, the Fourth Circuit has held that a plaintiff satisfies the exhaustion requirement where the lawsuit and the EEOC charge allege the same underlying claim—such as retaliation or discrimination on the basis of disability—even if the conduct alleged to support that claim varies between the charge and the in-court complaint. *Id.* at 594-595. By contrast, an employee's claim is procedurally barred if the charge alleges discrimination on one basis—such as race—while the suit alleges discrimination on another basis—such as sex. *Chacko*, 429 F.3d at 509.

The exhaustion requirement also does not bar a Title VII claim if that claim was "developed by [the EEOC's] reasonable investigation" of the charge, or if it should "have arisen from" that investigation. *Id.* at 506, 509 (internal quotations marks omitted). Because exhaustion is an affirmative defense, *see, e.g.*, *Spearman v. City of Annapolis*, No. 21-cv-1779-JKB, 2022 WL 316641, at *4 (D.Md. Feb. 1, 2022),[6] a court generally cannot dismiss a

---

[6] The Fourth Circuit previously considered Title VII exhaustion to be a jurisdictional requirement, rather than an affirmative defense. *See, e.g.*, *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). The Supreme Court, however, recently clarified that an alleged failure to exhaust under Title VII is not a jurisdictional prescription but rather a defense that an

claim on exhaustion grounds unless the defendant can show that the
necessary facts "clearly appear[] *on the face of the complaint*."
*See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)
(citation omitted).

The University has not met that burden here.  Indeed, the
Amended Complaint raises claims that *are* reasonably related to the
EEOC charge.  The charge alleges that "[d]uring the course of [his]
employment," Plaintiff was "subjected to harassment by Director
John Romano."  (ECF No. 12-2).  That allegation is reasonably
related to the hostile work environment claims made in the Amended
Complaint—namely, that Plaintiff faced harassment throughout his
employment, which John Romano both perpetrated and condoned.  (ECF
No. 8, at 5).  The charge also alleges that Plaintiff's layoff was
caused by race discrimination.  (ECF No. 12-2).  A reasonable
investigation of that allegation would likely reveal the details
about the layoff catalogued in the Amended Complaint.  (ECF No. 8,
at 6-8).  *See Chacko*, 429 F.3d at 512 ("A Title VII plaintiff can

---

employer may raise to defeat a Title VII claim—much like the
argument that a claim is barred under a statutory time limit.  *Fort
Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1850-1852 (2019).  Following
that holding, "[c]ourts now treat the Title VII charge-filing
requirement as an affirmative defense."  *Spearman*, 2022 WL 316641,
at *4 (collecting cases); *see also Hickey v. Brennan*, 969 F.3d
1113, 1118 (10th Cir. 2020) ("Th[e] regulatory exhaustion
requirement is not a jurisdictional prerequisite for suit but is
a claims-processing rule that the employer may raise as an
affirmative defense.").

of course exhaust administrative remedies if a reasonable investigation of his [EEOC] charge would have uncovered the factual allegations set forth in formal litigation.").

The University's primary response is that the Amended Complaint discusses incidents of harassment that the charge does not mention. (ECF No. 12-1, at 7). However, a Title VII suit need not rest solely on the conduct listed in the EEOC charge, as long as the underlying claims remain consistent throughout. *Sydnor*, 681 F.3d at 595. In this case, the underlying claims in the charge are the same as those raised in this suit. *Id.* The charge alleged a racially discriminatory layoff and racial harassment during the course of Plaintiff's employment. (ECF No. 12-2). The Amended Complaint likewise alleges a racially discriminatory layoff and a racially hostile work environment based on harassment throughout Plaintiff's employment. (ECF No. 8, at 11-13). While the alleged conduct used to support those claims varied, that variance is not dispositive. *Sydnor*, 681 F.3d at 595; *see also Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000) (holding that Title VII exhaustion did not bar an employee's retaliation claim because the lawsuit and the EEOC charge both claimed retaliation, even though the charge and the in-court complaint alleged different examples of retaliatory actions).

The University also argues that the charge names only one party—John Romano—while the Amended Complaint also names as defendants John Farley, Laurie Locascio, and Steven Fetter. (ECF No. 16, at 4). To begin with, the only Defendant to the Title VII claim is the University—and the University is of course referenced in the EEOC charge. (ECF No. 12-2). Mr. Farley, Ms. Locascio, and Mr. Fetter are Defendants only to the §§ 1983 and 1981 claim in count II. Thus, it incorrect to say that Plaintiff has raised a Title VII claim against a "party" that he did not name in his charge. A lawsuit may be barred on exhaustion grounds where the EEOC charge alleges certain discriminatory acts done by certain individuals, while the lawsuit alleges *different* acts done by a *different* set of individuals. *Chacko*, 429 F.3d at 511. This case, however, is nothing like that. The EEOC charge and the Amended Complaint both allege a racially discriminatory layoff. Of course, *someone* at the University must have conducted that layoff, and the Amended Complaint alleges that it was Mr. Farley, Ms. Locascio, and Mr. Fetter who administered and approved it. (ECF No. 8, at 8, 10-11). Assuming those allegations are correct, a reasonable investigation of the charge would presumably have implicated those three people. This suit thus does not involve a "rotating cast of characters" like other suits that have been barred on exhaustion grounds. *Sydnor*, 681 F.3d at 595.

13

Nor is it dispositive that the EEOC charge purportedly "covers the period from April 25, 2018[,] through November 15, 2018," while the Amended Complaint "expands the time period of the alleged discriminatory conduct to 2009 through 2018." (ECF No. 16, at 4). At most, the charge is internally inconsistent about the time period during which the harassment occurred. It does at one point list April 25, 2018, as the "earliest" date that "[d]iscrimination [t]ook [p]lace." (ECF No. 12-2). However, it also explains that racial harassment occurred "during the course of [Plaintiff's] employment," which "began . . . on July 7, 2009." (ECF No. 12-2). In any case, the Fourth Circuit held last year that Title VII's exhaustion requirement does not prevent a plaintiff from including in a Title VII suit "incidents" from an "earlier period of employment" that were "not mentioned . . . in [the] EEOC charge," as long as that earlier period is relevant to the claims that the charge *does* mention. *Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 235, 236 (4th Cir. 2022). The University has failed to show that the earlier incidents of harassment in the Amended Complaint are irrelevant to the harassment mentioned in the EEOC charge, so the Title VII claims cannot be dismissed for a failure to exhaust.

Finally, even if some allegations in the Amended Complaint seem somewhat disconnected from the EEOC charge, Plaintiff could still raise those allegations in court if they were developed by

the EEOC's investigation. *Chacko*, 429 F.3d at 506. Indeed, in deciding exhaustion, the Fourth Circuit has considered whether certain allegations "surface[d] . . . during the EEOC investigation" or were "mention[ed] . . . in any of the EEOC investigative reports." *Walton v. Harker*, 33 F.4th 165, 172-173 (4ᵗʰ Cir. 2022). Thus, it would be especially inappropriate to dismiss Plaintiff's claims on exhaustion grounds at this early stage—before any details about the EEOC's investigation are known. The Amended Complaint does not mention the EEOC investigation, and neither party has attached documents related to the investigation to their briefs. Thus, it is unclear precisely which facts may have surfaced during the EEOC investigation or may have been mentioned in the EEOC investigative reports. Therefore, facts that may be necessary to the exhaustion defense—that is, potentially dispositive facts about the EEOC investigation—do not clearly appear on the face of the complaint. For that reason alone, the court cannot dismiss Plaintiff's claims on exhaustion grounds.

### 2.  Time Bar

The University argues that "any claim based on events occurring prior to April 25, 2018" is time-barred under Title VII. (ECF No. 12-1, at 8). As relevant here, Title VII requires a plaintiff to file an EEOC charge within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-

5(e)(1).  Because an EEOC charge is a prerequisite to filing suit, courts have treated this 300-day requirement "like a statute of limitations" for Title VII claims.  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  Like exhaustion, the argument that a claim is time-barred is an affirmative defense.  *Goodman*, 494 F.3d at 464.[7]  Defendants do not explain whether they believe the time bar applies to the disparate treatment claim, the hostile work environment claim, or merely to certain allegations underlying each of those claims.

First, the disparate treatment claim based on Plaintiff's termination is not time-barred.  A Title VII claim based on a discrete discriminatory act—like a termination—is time-barred only if the employee failed to file an EEOC charge within 300 days "after the act . . . occurred."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-114 (2002).  Plaintiff's termination occurred on November 15, 2018, (ECF No. 8, at 6), and he filed his EEOC charge on February 19, 2019—fewer than 300 days later.  (ECF No. 12-2).

The University also mistakenly argues that Plaintiff is categorically barred from supporting his disparate treatment claim

---

[7] *See Shaukat v. Mid Atl. Pros., Inc.*, No. 20-cv-3210-TDC, 2021 WL 5743909, at *5 (D.Md. Nov. 30, 2021) (noting that Title VII's time bar is an "affirmative defense"); *Sharpe v. Prince George's Cnty. Gov't*, No. 17-cv-3799-TDC, 2021 WL 928177, at *9 (D.Md. Mar. 11, 2021) (same).

using events that occurred more than 300 days before he filed his charge.  Rather, an employee may use discriminatory incidents that occurred outside the statutory time period as background evidence in support of a timely claim.  *Morgan*, 536 U.S. at 105, 113.  Thus, while Plaintiff could not—and does not—claim that Defendants are independently liable for discrete discriminatory acts that occurred outside the statutory period, *id.* at 113-114, he can use past acts as background evidence, assuming that those acts would be relevant to proving that his firing itself was motivated by race.  *Chapman*, 48 F.4th at 235-236; *see also Woods v. City of Greensboro*, 855 F.3d 639, 649-650 (4th Cir. 2017) (holding that "a general pattern of racial discrimination in the practices of a defendant" and past examples of disparate treatment can be relevant evidence in deciding whether race motivated the particular discriminatory act over which a plaintiff is suing).

Second, it is unclear from the face of the complaint whether Plaintiff's hostile work environment claim is time-barred.  A hostile work environment claim is "different in kind" from a claim based on a discrete discriminatory act.  *Morgan*, 536 U.S. at 115.  Indeed, a hostile work environment claim is "composed of a series of separate acts" that by themselves may not be actionable but together "constitute one 'unlawful employment practice.'"  *Id.* at 115-117 (quoting 42 U.S.C. § 2000e-5(e)(1)).  This unlawful practice "cannot be said to occur on any particular day."  *Id.* at

115.  Thus, a hostile work environment claim is not time-barred as long as at least one act "contributing to the claim" occurred within the statutory period.  *Id.* at 117.  If that requirement is met, the statute's time bar does not prevent an employee from raising a hostile work environment claim that seeks to hold the employer "liable for *all* acts" that made the work environment hostile—including those which occurred outside the statutory period.  *Id.* at 118 (emphasis added).

Here, Plaintiff's hostile work environment claim rests on a series of events which apparently occurred throughout the nine years that Plaintiff worked for the University.  The Amended Complaint does not provide a specific date for most of these incidents—rather, it alleges that the harassment occurred "from 2009 through 2018."  (ECF No. 8, at 5).  If any of these incidents occurred between April 2018 (when the statutory period began) and November 2018 (when Plaintiff was fired), then the hostile work environment claim would not be time-barred.  It is unclear from the face of the complaint whether any such incident occurred during that period.  Thus, because a claim cannot be dismissed as time-barred unless all necessary facts clearly appear on the face of the complaint, the court will not dismiss Plaintiff's hostile work environment claim as time-barred under Title VII.  However, as explained below, the hostile work environment claim will be

dismissed because Plaintiff has failed to allege facts sufficient to state a claim.

### 3.   Failure to State a Disparate Treatment Claim

The University argues that the Amended Complaint fails to state a claim for disparate treatment under Title VII. (ECF No.12-1, at 8).  Title VII bars an employer from "discharg[ing]" or "otherwise . . . discriminat[ing] against" an employee "because of" that employee's race. 42 U.S.C. § 2000e-2(a)(1).  Thus, to survive a motion to dismiss, a plaintiff claiming disparate treatment under Title VII must allege facts sufficient to "support a reasonable inference" that the employer discharged or discriminated against the employee "because of . . . race." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015).  The allegation that an employer treated a Black employee more harshly than a similarly situated employee of another race may be sufficient to create this reasonable inference, *see, e.g.*, *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022), unless an "obvious alternative explanation" makes it implausible that the differential treatment occurred because of race.  *See McCleary-Evans*, 780 F.3d at 588 (internal quotation marks omitted).

Plaintiff has alleged facts sufficient to support a reasonable inference that the University fired him because of his race.  Specifically, the Amended Complaint alleges that the

University gathered three African American employees—including, apparently, two of the three total African American males in the office, (ECF No. 8, at 5)—and took them to a secure building which had been evacuated. (ECF No. 8, at 6-7). University officials then told each employee about the layoff separately, stripped him or her of building access, and barred them from returning to the office to collect their things. (ECF No. 8, at 7). All of this was done with an armed officer present. (ECF No. 8, at 7).

By contrast, Caucasian employees laid off during Plaintiff's tenure were treated with far less hostility. (ECF No. 8, at 4, 7). They received advanced notice of the layoff, were told about the layoff in their regular work location and were allowed to return to their office to collect personal belongings. (ECF No. 8, at 4, 7). More still, they were laid off without armed security officers present. (ECF No. 8, at 4, 7).[8]

---

[8] The Amended Complaint inconsistently states that the layoffs of the Caucasian employees occurred in "April 2013" in one place and in "April 2017" in several other places. (ECF No. 8, at 5, 7). While the original Complaint stated exclusively that the layoffs of Caucasian employees occurred in "April 2013," (ECF No. 1, at 3, 5), the Amended Complaint changed several of these references to state that the layoffs occurred in 2017. The single remaining reference to "April 2013" may be a typographical error. (ECF No. 8, at 5). Of course, because Plaintiff was laid off in 2018, a 2017 layoff of a Caucasian employee would be a somewhat more analogous comparator than a 2013 layoff. Either way, Plaintiff has alleged enough to survive a motion to dismiss. Indeed, "determinations regarding whether [a] comparator[]" is "sufficiently similar" generally "should not be made . . . at the 12(b)(6) stage." *Woods*, 855 F.3d at 650-651. Rather, "[t]he similarly situated analysis" should be "dealt with through summary

The alleged contrast between the layoffs of African American and Caucasian employees—and in particular, the hostile manner in which Plaintiff and his African American co-workers were treated— is enough to support a reasonable inference that Plaintiff faced discrimination because of race. *McCleary-Evans*, 780 F.3d at 585; *see also Holloway*, 32 F.4th at 299 (holding that a Black employee had raised the inference of a Title VII violation because she had alleged that she was disciplined for certain conduct, while co-workers of another race who engaged in the same conduct did not receive a disciplinary sanction). This conclusion also finds support in the University's own investigation of the firing. Indeed, after Plaintiff's grievance prompted an internal inquiry, the University's hearing examiner found that the manner in which the layoffs were conducted may "at worst" be "a clear indication of racial discrimination." (ECF No. 8, at 9).

Nor does there appear to be an obvious alternative explanation for Defendants' differential treatment. *McCleary-Evans*, 780 F.3d at 588. The Amended Complaint alleges that "[t]he stated reason for [Plaintiff's] termination was budgetary constraints." (ECF No. 8, at 8). Of course, it may very well be true that the

---

judgment under Rule 56." *Id.* (citations omitted); *see also Holloway*, 32 F.4th at 299 (noting that while discovery may show that a Black plaintiff and comparators of another race are more "distinguishable" than they appear based on the complaint, the "similarly situated analysis typically [does not] occur[] . . . at the 12(b)(6) stage") (internal quotation marks omitted).

University fired Plaintiff to cut costs, but that does not explain why it fired him *in this particular manner*—that is, by isolating him in a separate building with an armed guard present, and by barring him from returning to his office to collect his things.

According to the Amended Complaint, the University claimed that the layoff was done this way because Defendant John Farley did not know the African American employees he was firing, "so he did not know how they would react" and "feared they would have a weapon." (ECF No. 8, at 7). That explanation makes race discrimination *more* plausible, not less. Indeed, an employer rarely expects that an employee will react well to being fired— yet few layoffs are conducted in the way that Plaintiff alleges here. That Mr. Farley simply *assumed* that three African American employees might react violently to their firing—despite not knowing those employees at all—suggests that he made stereotypical assumptions based on the employees' race. *See Woods*, 855 F.3d at 652 (reasoning that a plaintiff had plausibly alleged race discrimination where the allegations in the complaint suggested that the defendant "impos[ed] . . . stereotypical expectations on an individual based on her . . . race").

Finally, in support of the motion to dismiss, the University proposes what it calls an "obvious alternate explanation" for the conduct: "Plaintiff was employed in a unit that required a high level of security, which in turn necessitated heightened security

protocols" for his firing.   (ECF No. 12-1, at 16).[9]   This

explanation is hardly obvious, and it certainly does not make

Plaintiff's claim implausible at this stage.   If Plaintiff's work

in a high-security office truly required such hostile termination

protocols, then other employees laid off from the same office would

be laid off the same way.   Plaintiff alleges that Caucasian co-

workers faced far different treatment.

And according to the Amended Complaint, a fourth employee who

had the same security access as Plaintiff was laid off on the same

day—but that employee was notified of her layoff in Mr. Farley's

office and was not required to report to a remote building where

there was an armed security presence.   (ECF No. 8, at 7-8).   While

the Amended Complaint does not specify that employee's race, the

alleged manner of her layoff suggests that the University does not

actually fire every employee with a high security clearance in the

way it fired Plaintiff.

The differential treatment outlined above relates to the

manner of Plaintiff's termination and not to its basis.   At this

stage, however, the two cannot be separated and an inference of

discrimination based on the manner of the termination applies to

---

[9]   This purported explanation did not appear in the Amended
Complaint.   A court deciding a motion to dismiss a Title VII
disparate treatment claim may consider "obvious alternate
explanation[s]" that do not appear in the complaint.   *McCleary-
Evans*, 780 F.3d at 588.

the basis for it as well.  Because Plaintiff has stated a plausible disparate treatment claim, the motion to dismiss that claim will be denied.

### 4.  Failure to State a Hostile Work Environment Claim

A hostile work environment claim involves four elements: (1) the employee "experienced unwelcome harassment," (2) "the harassment was based on [the employee's] . . . race," (3) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," and (4) "there is some basis for imposing liability on the employer." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).  Defendants argue that Plaintiff does not allege conduct that is sufficiently severe or pervasive to sustain a hostile work environment claim.  (ECF No. 12-1, at 9).

To "satisfy the . . . severe or pervasive test," a plaintiff must "clear a high bar."  *Perkins v. Internat'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (internal quotation marks omitted). Allegations of "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are generally insufficient. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Nor can a plaintiff state a hostile work environment claim by alleging mere "rude treatment by coworkers, callous behavior by . . . superiors," or "[i]ncidents that would objectively give rise to bruised or wounded feelings."  *Perkins*, 936 F.3d at 208 (cleaned

up).  Taken together, Plaintiff's allegations do not clear this high bar.

First, the Amended Complaint alleges that a "[f]acilities [m]anager" once approached Plaintiff and asked, "weren't your people once referred to as 'Spades?'" (ECF No. 8, at 5).  "Spade" is an "offensive term[] used to demean" Black Americans.  *See* Okianer Christian Dark, *Racial Insults: Keep Thy Tongue From Evil*, 24 Suffolk U.L.Rev. 559, 567 n.47 (1990).  However, the "mere utterance" by a co-worker "of an . . . epithet which engenders offensive feelings" is generally insufficient to create a hostile work environment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Of course, the Fourth Circuit has held that the "use of the n-word or a similar racial slur . . . can engender a hostile work environment," *see Chapman*, 48 F.4th at 235—but that is only when the person who uses the slur is a supervisor or someone who the plaintiff reasonably believes has "power" over the plaintiff's employment.  *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 279 (4th Cir. 2015) (en banc).  The Amended Complaint does not allege that the person who used the slur had any power over Plaintiff's employment.  Indeed, it provides almost no context for the incident, other than alleging that the speaker was a facilities manager.  (ECF No. 8, at 5).  Without more detail, this allegation is closer to a co-worker's use of an offensive epithet, *see Harris*,

510 U.S. at 21, than it is to a supervisor's use of the n-word, *see Boyer-Liberto*, 786 F.3d at 280.

Next, Plaintiff alleges that certain unnamed co-workers referred to Plaintiff using "the names of other male . . . employees who also belonged to a minority group," and that one employee said he thought Plaintiff would "sound" different based on Plaintiff's "last name." (ECF No. 8, at 3, 5). While these interactions could certainly be hurtful, mere rude treatment by coworkers that causes wounded feelings is insufficient to create a hostile work environment. *Perkins*, 936 F.3d at 208.[10] The Amended Complaint also provides no detail on how often Plaintiff was misnamed—thus, it fails to allege that this conduct was sufficiently pervasive to create a hostile work environment. Further, Plaintiff's other allegations of race-related harassment— for example, that he faced a "racially discriminatory screening process," that the workplace had a "discriminatory culture," and that he was subjected to "job bias and humiliation," (ECF No. 8, at 3, 5)—are too conclusory and unspecific to be taken as true.

Finally, Plaintiff makes a host of allegations that do not appear to be related to his race at all. For instance, he alleges

---

[10] *See also Nwosu v. Ochsner Med. Ctr. Clinic Found.*, No. 10-1954, 2011 WL 2470890, at *1, *4 (E.D.La. June 20, 2011) (holding that a plaintiff did not prove a hostile work environment by showing that she was "called by the wrong name on several occasions," including being called "the names of two of her [minority] coworkers").

that a supervisor told him "he was not getting 'shit,'" that "his opinions were not respected," that he received a purportedly false Letter of Counseling, and that another employee "angrily confronted" him during a dispute over a co-worker's office assignment. (ECF No. 8, at 5-6). These allegations might suggest that Plaintiff endured a harsh work environment. Title VII, however, does not "guarantee a happy workplace"—"only one free from unlawful discrimination." *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997). Thus, where a plaintiff claims a racially hostile work environment, he or she cannot support that claim with allegations that "do not seem to have anything to do with . . . race." *Bass*, 324 F.3d at 765.

All told, when considering only the harassment allegations that are both race-related and non-conclusory, Plaintiff's hostile work environment claim seems to rest on one instance in which a racial slur was used and a few instances in which co-workers either commented on Plaintiff's name or referred to Plaintiff using the wrong name. That does not constitute the kind of severe and pervasive conduct that typically creates a hostile work environment.

**B.   §§ 1981 and 1983 Claim**

In count II, Plaintiff claims that Defendants John Romano, John Farley, Laurie Locascio, and Steven Fetter, acting in their official capacities, violated §§ 1981 and 1983 of the Civil Rights

27

Act of 1866, pursuant to a custom or policy that allows for racial discrimination.[11]   (ECF No. 8, at 13).   Defendants move to dismiss on several alternative grounds.

Defendants first argue that these claims are barred by Eleventh Amendment state sovereign immunity.   (ECF No. 12-1, at 12).   Under the Eleventh Amendment, a state is "immune from suits brought in federal courts by her own citizens as well as by citizens of another state."   *Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 100 (1984) (internal quotations omitted).   This immunity applies "regardless of the nature of the relief sought." *Id.*[12]   A suit brought against a state official in his or her official capacity is considered a suit against the state and is thus generally barred under the Eleventh Amendment.   *Kentucky v. Graham*, 473 U.S. 159, 165-66, 169 (1985).   However, under a sovereign immunity exception first recognized in *Ex Parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment allows a plaintiff to

---

[11] Defendants do not question the adequacy of Plaintiff's support for asserting that there was a custom or policy.

[12] A state may waive its sovereign immunity or "Congress may abrogate it by appropriate legislation."   *Va. Off. of Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253-54 (2011).   For example, in passing Title VII, Congress abrogated states' sovereign immunity from Title VII suits.   *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452 (1976).   That is why the Eleventh Amendment does not bar Plaintiff's Title VII claims being brought directly against the University.   However, the Civil Rights Act of 1866 did not abrogate states' sovereign immunity from suits under §§ 1983 and 1981.   *See Quern v. Jordan*, 440 U.S. 332, 342 (1979).

sue a state official in his or her official capacity for relief that is "properly characterized as prospective." *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks omitted).

Plaintiff's §§ 1983 and 1981 claim satisfies the *Ex Parte Young* exception. Plaintiff sued the individual Defendants in their official capacities. (ECF No. 8, at 3). He also seeks prospective relief against those Defendants—namely, he asks the court to order Defendants "to reinstate [his] employment." (ECF No. 8, at 16). Every circuit, including the Fourth Circuit, "has held that claims for reinstatement to previous employment meet the *Ex Parte Young* exception." *Biggs v. N.C. Dep't Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020) (collecting cases). While the Amended Complaint also seems to request monetary relief against the individual Defendants, (ECF No. 8, at 15-16), Plaintiff explained in his Response to the Motion to Dismiss that he "does not oppose dismissal" of that request. (ECF No. 15, at 21).

Defendants also contend that any actions that occurred more than four years prior to the filing of the complaint naming each Defendant are barred by the statute of limitations. (ECF No. 12-1, at 13). Plaintiff "acknowledges that [§] 1981 has a four year statute of limitations." (ECF No. 15, at 17). The Amended Complaint alleges that the termination itself occurred in November 2018, which is within the statutory four-year period. Beyond that,

the Amended Complaint does not provide a specific date for the majority of the remaining allegations that Plaintiff makes. Thus, because it is not clear from the face of the complaint whether the statute of limitations bars any part of the §§ 1983 and 1981 claim, the court will not dismiss the claim on that basis at this stage. *See Goodman*, 494 F.3d at 464.

Finally, Defendants argue that Plaintiff has failed to state a §§ 1983 and 1981 claim because they believe that the Amended Complaint fails to allege that the individual Defendants were sufficiently involved in a violation of Plaintiff's statutory rights. (ECF No. 12-1, at 14-16). That argument is unpersuasive. Defendants acknowledge that a party may violate §§ 1983 and 1981 by "terminat[ing]" an employee "'because of' . . . race," (ECF No. 12-1, at 14), and the Amended Complaint alleges that three of the Defendants were personally involved in the allegedly discriminatory layoff. It alleges that Mr. Farley "administered" the layoff, and that Ms. Locascio and Mr. Fetter "approved" the layoff, even though both knew that the reason given—a lack of funds—was false. (ECF No. 8, at 8, 11). Thus, Defendants are mistaken to argue that the Amended Complaint does not sufficiently allege personal involvement in a violation of statutory rights by Defendants Farley, Locascio and Fetter.

On the other hand, the Amended Complaint does not clearly explain how Defendant Romano was involved in the layoff. However,

Defendants do not argue that any action short of a firing cannot be a basis for liability under §§ 1981 and 1983. To the contrary, Defendants acknowledge that Plaintiff may "state a claim under § 1981" by alleging that he was "terminated *or otherwise treated less favorably* 'because of' his race." (ECF No. 12-1, at 14) (emphasis added). The Amended Complaint *does* allege that Mr. Romano treated Plaintiff less favorably because of race, both by condoning and perpetrating racial harassment against Plaintiff in the workplace. (ECF No. 8, at 5). Indeed, several of the incidents that Mr. Romano allegedly condoned were on their face connected to Plaintiff's race, such as the instance in which Plaintiff was called a "Spade[]," and the multiple instances in which Plaintiff was called the names of his minority co-workers. (ECF No. 8, at 5). While these allegations are insufficient to meet the high bar of a hostile work environment claim, they are enough to allege plausibly that Mr. Romano treated Plaintiff less favorably because of race. Thus, Defendants have not shown that the §§ 1983 and 1981 claim against Mr. Romano should be dismissed.

## IV. Conclusion

Plaintiff has failed to state a Title VII hostile work environment claim in count one and concedes that money damages are not recoverable against the individual defendants in count two, and those claims will be dismissed. On the other hand, Defendants have not justified dismissal of Plaintiff's Title VII disparate

31

treatment claim or his §§ 1983 and 1981 claim for prospective injunctive relief and the motion to dismiss will be denied as to those claims.

                                      /s/
                              _____
                              DEBORAH K. CHASANOW
                              United States District Judge